**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASYLUM SEEKERS TRYING TO ASSURE THEIR SAFETY, et al., <br> Plaintiffs, <br><br> v. <br><br> TAE D. JOHNSON, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, et al., <br> Defendants. | No. 23-cv-00163-RCL |

**UNOPPOSED MOTION OF THE CAPITAL AREA IMMIGRANTS' RIGHTS COALITION FOR LEAVE TO FILE A BRIEF AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

ELLYN JAMESON
D.D.C. Bar ID D00594
D.C. Bar No.1765412 *admitted to
the Bar under D.C. App. R. 46-A
(Emergency Examination Waiver) and
supervised by a licensed D.C. Bar member*
PA Bar No. 328987
Capital Area Immigrants' Rights Coalition
1025 Connecticut Ave NW, Suite 701
Washington D.C., 20036
202-449-4586
ellyn@caircoalition.org

*Counsel for Movant, Capital Area
Immigrants' Rights Coalition*

**UNOPPOSED MOTION OF THE CAPITAL AREA IMMIGRANTS' RIGHTS COALITION FOR LEAVE TO FILE A BRIEF AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Pursuant to Local Civil Rule 7(o), the Capital Area Immigrants Rights' Coalition (CAIR Coalition) respectfully requests this Court's leave to file the accompanying *amicus curiae* brief in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss. CAIR Coalition has conferred with counsel for the parties and both Plaintiffs and Defendants consent to the filing of CAIR Coalition's *amicus* brief. Therefore, this motion is unopposed. It is also being filed prior to the completion of briefing on the motion to dismiss, thus it will not delay the Court's adjudication of the motion. *See* LCvR 7(o)(2).

CAIR Coalition is a nonprofit 501(c)(3) public interest legal services provider dedicated to representing detained, indigent people in removal proceedings before the immigration courts, Board of Immigration Appeals ("BIA"), and federal courts. CAIR Coalition has litigated, or filed *amicus curiae* briefs with respect to, a wide variety of immigration-related cases, ranging from the immigration consequences of certain criminal convictions to the use of Interpol Red Notices in immigration court. CAIR Coalition represents multiple individuals impacted by the November 2022 data breach in their ongoing immigration cases.

"[T]he fact, extent, and manner of participation" by an *amicus* is "solely within the discretion of the Court." *Cobell v. Norton*, 246 F. Supp. 2d 59, 62 (D.D.C. 2003) (quotations omitted). An *amicus* brief should normally be allowed "when the *amicus* has an interest in some other case that may be affected by the decision in the present case (though not enough affected to entitle the *amicus* to intervene and become a party in the present case), or when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Id.* (quotations omitted). Local Civil Rule 7(o)(2) requires a motion for leave to file an *amicus* brief to set forth the reasons why an *amicus* brief is desirable, why the

movant's position is not adequately represented by a party, and why the matters asserted are relevant to the disposition of the case. LCvR 7(o)(2).

CAIR Coalition submits that its proposed *amicus* brief is both desirable and not duplicative of Plaintiffs' position because it provides grounds for concluding that Plaintiffs' claims should not be dismissed, in addition to those that are provided by Plaintiffs. Our *amicus* brief:

- Provides relevant background about evidentiary burdens in immigration court,
- Explains that the remedy sought by Plaintiffs is reasonable and necessary,
- Demonstrates practical implications of the existing remedy.

As an experienced provider of immigration legal services with practical experience in representing and advising detained individuals impacted by the data breach, CAIR Coalition is uniquely well-positioned to speak to these issues, which relate to the evidentiary burdens in immigration courts, as well as practical implications of the data breach and the remedies that the Plaintiffs have requested of this Court. The Plaintiffs' brief does not address the complex nature of removal proceedings, evidentiary requirements, and burdens in immigration courts and how those relate to the requested relief. These issues are relevant to this Court's decision on Defendants' motion to dismiss; accordingly, the attached brief may aid the Court.

Finally, in compliance with LCvR 26.1, the Capital Area Immigrants' Rights Coalition ("CAIR Coalition") certify that to the best of our knowledge and belief, that it is a private, non-profit organization, with no parent company, and no publicly held company holds 10% or more of its stock which have any outstanding securities in the hands of the public or has a direct financial interest in the outcome of this litigation. This case does not arise out of a bankruptcy proceeding and is not a criminal case in which there was an organizational victim.

For the foregoing reasons, CAIR Coalition respectfully requests that the Court grant its motion for leave to file the accompanying *amicus curiae* brief.

Dated: April 24, 2023

Respectfully Submitted,

/s/ Ellyn Jameson

D.D.C. Bar ID D00594
D.C. Bar No.1765412 *admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver) and supervised by a licensed D.C. Bar member*
PA Bar No. 328987
Capital Area Immigrants' Rights Coalition
1025 Connecticut Ave NW, Suite 701
Washington D.C., 20036
202-449-4586
ellyn@caircoalition.org
*Counsel for Movant, Capital Area Immigrants' Rights Coalition*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2023, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

<u>/s/ Ellyn Jameson</u>

D.D.C. Bar ID D00594
D.C. Bar No.1765412 *admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver) and supervised by a licensed D.C. Bar member*
PA Bar No. 328987
Capital Area Immigrants' Rights Coalition
1025 Connecticut Ave NW, Suite 701
Washington D.C., 20036
202-449-4586
ellyn@caircoalition.org
*Counsel for Movant, Capital Area Immigrants' Rights Coalition*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASYLUM SEEKERS TRYING TO ASSURE THEIR SAFETY, et al.,<br>Plaintiffs,<br><br>v.<br><br>TAE D. JOHNSON, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, et al.,<br>Defendants. | No. 23-cv-00163-RCL |

## **PROPOSED ORDER**

Upon consideration of the Capital Area Immigrants' Rights Coalition's Unopposed Motion for Leave to File a Brief as *Amicus Curiae* in Support Of Plaintiffs' Opposition To Defendants' Motion To Dismiss, it is hereby **ORDERED** that the movant's motion is **GRANTED**.

**SO ORDERED.**

Dated: _____                              _____

                                                    Royce C. Lamberth

                                                    United States District Judge

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASYLUM SEEKERS TRYING TO ASSURE THEIR SAFETY, et al.,<br>Plaintiffs,<br><br>v.<br><br>TAE D. JOHNSON, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, et al.,<br>Defendants. | No. 23-cv-00163-RCL |

## BRIEF OF *AMICUS CURIAE* THE CAPITAL AREA IMMIGRANTS' RIGHTS (CAIR) COALITION IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

ELLYN JAMESON
D.D.C. Bar ID D00594
D.C. Bar No.1765412 *admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver) and supervised by a licensed D.C. Bar member*
PA Bar No. 328987
Capital Area Immigrants' Rights Coalition
1025 Connecticut Ave NW, Suite 701
Washington D.C., 20036
202-449-4586
ellyn@caircoalition.org

*Counsel for* Amicus Curiae, *Capital Area Immigrants' Rights Coalition*

**LCvR 26.1 DISCLOSURE STATEMENT**

The Capital Area Immigrants' Rights Coalition ("CAIR Coalition") certifies that to the best of our knowledge and belief, that it is a private, non-profit organization, with no parent company, and no publicly held company holds 10% or more of its stock which have any outstanding securities in the hands of the public or has a direct financial interest in the outcome of this litigation. This case does not arise out of a bankruptcy proceeding and is not a criminal case in which there was an organizational victim.

# TABLE OF CONTENTS

I.   STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................ 1

II.   ARGUMENT ................................................................................................................... 1

A.   RESPONDENTS IN REMOVAL PROCEEDINGS CARRY THE BURDEN OF PROOF, MEANING THAT THE PLAINTIFFS ARE NOW TASKED WITH PROVIDING THE IMMIGRATION COURT WITH EVIDENCE THAT ONLY THE GOVERNMENT POSSESSES. ........................................................................................................... 3

    1.   Asylum seekers carry the legal burden in removal proceedings to prove by a preponderance of the evidence that they are entitled to protection. ......................................... 3

    2.   Burden shifting on specific issues is common in immigration courts and other federal courts. .............................................................................................................. 6

B.   WITHOUT A PRESUMPTION, THE CURRENT REMEDY IS INSUFFICIENT AND DOES NOT MAKE PLAINTIFFS WHOLE. ............................................................ 8

    1.   ICE has not provided meaningful access to important evidence related to the data breach. ............................................................................................................... 8

    2.   Plaintiffs who relitigate their fear claims without access to the missing evidence have no meaningful remedy. .......................................................................................... 9

    3.   CAIR Coalition has repeatedly tried to access this evidence to no avail. ...................... 11

    4.   The inability to access this evidence violates Plaintiffs' due process rights. ................. 15

    5.   This evidence is especially relevant and probative given the autocratic regimes and violent nonstate actors that the Plaintiffs fear. ....................................................... 16

C.   THE CURRENT REMEDY IS IN FACT HARMFUL BECAUSE IT PROLONGS DETENTION. ......................................................................................................... 20

III.   CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Anim v. Mukasey*,
   535 F.3d 243 (4th Cir. 2008) …………………………………………………...9–10, 17

*Armstrong v. Manzo*,
   380 U.S. 545 (1965)………………………………………………………………..23

*Bell v. Hood*,
   327 U.S. 678 (1946)……………………………………………………………….9

*Brady v. Maryland*,
   373 U.S. 83 (1963)……………………………………………………………….10

*Brito v. Barr*,
   415 F. Supp. 3d 258 (D. Mass. 2019)………………………………….………….8

*Brito v. Garland*,
   22 F.4th 240 (1st Cir. 2021)………………………………………….…………….8

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)……………………………………………………………….9

*Colmenar v. INS*,
   210 F.3d 967 (9th Cir. 2000)…………………………………………………….15, 16

*Dent v. Holder*,
   627 F.3d 365 (9th Cir. 2010)…………………………………………………...12, 15

*Dubon Miranda v. Barr*,
   463 F. Supp. 3d 632 (D. Md. 2020)…………………………………………………7

*Franco-Gonzalez v. Holder*,
   No. 10-cv-02211, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013)…………………..…..7

*Guerrero-Sanchez v. Warden York Cnty. Prison*,
   905 F.3d 208 (3d Cir. 2018)……………………………………………………7–8

*Hammad v. Holder,*
 603 F.3d 536 (9th Cir. 2010)……………………………………………………...15

*Hussain v. Gonzalez,*
 424 F.3d. 622 (7th Cir. 2005)……………………………………………………..15

*Ibarra Chevez v. Garland,*
 31 F.4th 279 (4th Cir. 2022)…………………………………………………….6

*Int'l Bhd. Of Teamsters v. United States,*
 431 U.S. 324 (1977)………………………………………………………………8

*Jenkins v. McKeithen,*
 395 U.S.411 (1969)…..…………………………………………………………9

*Johnson v. Arteaga-Martinez,*
 142 S. Ct. 1827 (2022)…………………………………………………………8

*Lin v. U.S. Dep't of Justice,*
 459 F. 3d 255 (2d Cir. 2006)……………………………………………………...17

*Mathews v. Eldridge,*
 424 U.S. 319 (1976)……………………………………………………………...23

*Matter of A-B-,*
 28 I&N Dec. 307 (A.G. 2021)……………………………………………………19

*Matter of J-F-F-,*
 23 I&N Dec. 912 (A.G. 2006)……………………………………………………5–6

*Matter of Khalifa,*
 21 I&N Dec. 107 (BIA 1995)……………………………………………………10

*Matter of L-A-C-,*
 26 I&N Dec. 516 (BIA 2015)……………………………………………………...4

*Matter of L-E-A-,*
 27 I&N. Dec. 40 (BIA 2017)……………………………………………………5

*Matter of L-E-A-*,
    27 I&N Dec. 581 (BIA 2019)……………………………………………………...5

*Matter of L-E-A-*,
    28 I&N Dec. 304 (A.G. 2021)…………………………………………………...5

*Matter of M-A-M-*,
    25 I&N Dec. 474 (BIA 2011)……………………………………………………21

*Matter of M-F-O-*,
    28 I&N Dec. 408 (BIA 2021)……………………………………………………...5

*Matter of Ramirez-Sanchez*,
    17 I&N Dec. 503 (BIA 1980)……………………………………………………16

*Matter of R-C-R-*,
    28 I&N Dec. 74 (BIA 2020)………………………………………………...15

*Matter of S-M-J-*,
    21 I&N Dec. 722 (BIA 1997)………………………………….……………...11, 16

*Matter of Teixeira*,
    21 I&N Dec. 316 (BIA 1996)…………………………………………...…16–17

*Matter of Wadud*,
    19 I&N 182 (BIA 1984)…………………………………………………16

*Matter of W-E-R-B-*,
    27 I&N Dec. 795 (BIA 2020)……………………………………………...…6

*Matter of Y-S-L-C-*,
    26 I&N Dec. 688 (BIA 2015)……………………………………………17

*Miranda v. Garland*,
    34 F.4th 338 (4th Cir. 2022)……………………………………………..7

*Ortez-Cruz v. Barr*,
    951 F.3d 190 (4th Cir. 2020)……………………………………………………7

*Reno v. Flores*,
    507 U.S. 292 (1993)…………………………………………………….…..15

*Zambrano v. Sessions*,
    878 F.3d 84 (4th Cir. 2017)………………………………………………18

*Zavaleta  v. Sessions*,
    873 F.3d 241 (4th Cir. 2017)……………………………………………….5

## **Statutes**

5 U.S.C. § 552(a)………………………………………………………………13

8 U.S.C. § 1101(a)(42)…………………………………………………………4

8 U.S.C. § 1158(b)(1)(B)……………………………………………………..3, 4

8 U.S.C. § 1225(b)(1)(A)………………………………………………………4

8 U.S.C. § 1229a…………………………………………………... 2, 3, 4, 6, 15, 22

8 U.S.C. § 1241(b)(3)………………………………………………………..2

## **Regulations**

8 C.F.R. § 208.4……………………………………………………………22

8 C.F.R. § 208.6…………………………………………………...…………2, 10, 17, 22

8 C.F.R. § 209.2……………………………………………………………22

8 C.F.R. § 1208.16……………………………………………………………2, 6

8 C.F.R. § 1208.17……………………………………………………………2

8 C.F.R. § 1208.18……………………………………………………………2, 5

8 CFR § 1240.1(c)……………………………………………………………17

8 C.F.R. § 1240.8(d)……………………………………………………………6

**Rules**

Fed. R. App. P. 29(a)…………………………………………………………………………...1

**Other**

Compl., *District of Columbia v. U.S. Immigration and Customs Enforcement*, No. 18-cv-2410 (D.D.C. Oct. 22, 2018)…………………………………...13

Memorandum from Kerry E. Doyle, Principal Legal Advisor, to All OPLA Attorneys re: Guidance to OPLA Attorneys Regarding the Enforcement of Civil Immigration Laws and the Exercise of Prosecutorial Discretion (April 3, 2022)………………………………………..16

*Training Module: Nexus and Protected Grounds*, Refugee, Asylum, and International Operations Directorate, U.S. Citizenship & Immigration Services (Dec. 20, 2019)………………………4–5

Tr. of Status Conference at 9:2–10:21, *Susan B. Long, et. al v. Immigration and Customs Enforcement, et. al*, No. 14-cv-109 (D.D.C. July 29, 2021)…………………………..…………13

## I.  STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE*

The Capital Area Immigrants' Rights Coalition ("CAIR Coalition") is a nonprofit legal services organization that provides legal services to indigent noncitizens detained by the U.S. Department of Homeland Security ("DHS"). CAIR Coalition provides Know Your Rights presentations, conducts *pro se* workshops for unrepresented litigants, and offers legal advice and representation to detained noncitizens in immigration proceedings. CAIR Coalition submits this *amicus* brief in support of the Plaintiffs' opposition to the government's Motion to Dismiss.

The outcome in this case is central to CAIR Coalition's mission to advance the rights and dignity of all immigrants, particularly those who are at risk of immigration detention and removal from the United States. *Amicus* seeks to provide the Court with context regarding the devastating impact of the publication of the unauthorized publication of Plaintiffs' personal identifying information by Immigration and Customs Enforcement ("ICE") in November and December 2022 and the insufficiency of the current remedy offered by DHS and ICE to this data breach.

Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus curiae* states that no counsel for either party authored any part of the brief, and no person or entity other than *amicus curiae* and its counsel made a monetary contribution to the preparation or submission of this brief. All parties have consented to the submission of this brief. *See* Fed. R. App. P. 29(a)(2).

## II.  ARGUMENT

On November 28, 2022, ICE unlawfully published on its website (ICE.gov) personal information of 6,252 people who are or were in immigration proceedings. This information included names, Alien numbers (a unique nine-digit number assigned to noncitizens), dates of birth, countries of citizenship, detention facility names, and other information including credible

or reasonable fear decisions associated with each case. First Am. Compl. ¶ 68, ECF No. 6. This breach of private data ("the data breach") violates 8 C.F.R. § 208.6(a)–(b).

As a remedy for the data breach, the U.S. government is now restarting removal proceedings for impacted noncitizens currently in the United States, even if they had previously lost their immigration cases. DHS has initiated these proceedings under 8 U.S.C. § 1229a (often referred to as "240 proceedings," per section 240 of the Immigration and Nationality Act ("INA")), which permits noncitizens to seek asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1] *See* Ex. B of First Am. Compl. at 2, ECF No. 6-2.

CAIR Coalition represents several asylum seekers[2] whose data was included in the November data breach and submits this *amicus* brief to explain the insufficiency of the current remedy available. This breach places the impacted individuals at increased risk of harm from their persecutors who may have had access to the data, which presents a new or heightened reason for persecution. Because of the demanding evidentiary burdens placed on asylum seekers in immigration court and the continued lack of access to probative evidence about the data breach within the government's control, the current remedy of restarting proceedings is a procedural façade without substance. As a result, DHS's proposed "remedy" prolongs Plaintiffs' detention without providing any additional protection or reassurance from the very real threats that the data breach has created.  Accordingly, as federal courts have done in other contexts, this Court should

---

[1] Removal proceedings under 8 U.S.C. § 1229a are distinct from those under 8 U.S.C. § 1241(b)(3), which only allows applicants to seek withholding of removal and protection under the Convention Against Torture pursuant to 8 C.F.R. §§ 1208.16 to 1208.18. Asylum and withholding of removal require applicants to show a likelihood of persecution, and protection under the CAT requires applicants to show a likelihood of torture.

[2] The term "asylum seeker" is used broadly throughout this brief to refer to individuals seeking humanitarian relief from removal in the form of Asylum, Withholding of Removal, and protection under the Convention Against Torture.

find that Plaintiffs are entitled to a presumption of persecution or torture as a result of the data breach in their future immigration hearings, which would correct for the current information asymmetry with respect to this issue.

**A. RESPONDENTS IN REMOVAL PROCEEDINGS CARRY THE BURDEN OF PROOF, MEANING THAT THE PLAINTIFFS ARE NOW TASKED WITH PROVIDING THE IMMIGRATION COURT WITH EVIDENCE THAT ONLY THE GOVERNMENT POSSESSES.**

In removal proceedings, it is the asylum seeker rather than the DHS who carries the evidentiary burden in establishing eligibility for relief against removal. *See* 8 U.S.C. § 1158(b)(1)(B)(i) ("In general . . . The burden of proof is on the applicant to establish that the applicant is a refugee . . . ."). As discussed below *infra* Section II.B, this makes sense in many instances when the respondent may be in the best position to identify and access information regarding their own fear.

This case, however, is not one of those instances. Here, resting the burden with the asylum seekers to show that the data breach places them individually at a heightened risk of harm puts the Plaintiffs in the impossible position of requiring them to furnish evidence that only DHS possesses. This need was created by DHS's own unlawful acts. Simply reopening removal proceedings does not address this illogical and unjust conundrum. Instead, the only appropriate remedy for data breach victims against whom DHS continues to prosecute removal cases is to place the evidentiary burden on DHS for this issue. The legal viability of this remedy is well-established by law.

**1. Asylum seekers carry the legal burden in removal proceedings to prove by a preponderance of the evidence that they are entitled to protection.**

Unlike in criminal proceedings, where the burden is on the government to establish facts sufficient to support a conviction, in removal proceedings in immigration court, the burden is on the respondent to provide sufficient evidence to prove that they are eligible for the requested relief. *See* 8 U.S.C. § 1229a(c)(4)(A) ("[A noncitizen] applying for relief or protection from removal has

the burden of proof to establish that the [noncitizen] (i) satisfies the applicable eligibility requirements; and (ii) with respect to any form of relief that is granted in the exercise of discretion, that the [noncitizen] merits a favorable exercise of discretion."). To satisfy this burden, respondents must "submit information or documentation in support of [their] application for relief or protection[.]" 8 U.S.C. § 1229a(c)(4)(B). The evidence must be "credible," "persuasive, and refer[] to specific facts." 8 U.S.C. § 1158(b)(1)(B)(ii). "In determining whether the applicant has met such burden, the immigration judge shall weigh the credible testimony *along with other evidence of record*." *Id.* (emphasis added). Although credible testimony alone can theoretically sustain an asylum seeker's burden, *id.*, in many cases "[t]he absence of corroborating evidence could lead to a finding that the applicant did not meet his burden of proof." *Matter of L-A-C-*, 26 I&N Dec. 516, 519 (BIA 2015).

Generally speaking, asylum seekers in removal proceedings may apply for three distinct but related fear-based defenses against deportation: (1) asylum, (2) withholding of removal under the INA, and (3) protection under the Convention Against Torture ("CAT"). 8 U.S.C. § 1225(b)(1)(A).

Applicants for asylum and withholding of removal must prove that they have a well-founded fear of persecution on account of a protected ground. *See* 8 U.S.C. § 1158(b)(1)(B)(i) (referencing the refugee definition in 8 U.S.C. § 1101(a)(42)). This requires, in part, that asylum seekers establish by a preponderance of the evidence, "1) the persecutor; 2) the harm suffered or feared; 3) the applicant's [protected] characteristic or belief…; and 4) the motivation of the persecutor." *See Training Module: Nexus and Protected Grounds*, Refugee, Asylum, and

International Operations Directorate, U.S. Citizenship & Immigration Services (Dec. 20, 2019).[3] The inability to identify the persecutor with a reasonable degree of certainty can be fatal to an asylum or withholding claim.

In this case, then, Plaintiffs must meet an evidentiary burden which only the opposing party is uniquely positioned to carry. Furthermore, "[t]he question of a persecutor's motive [involves] a particularized evaluation of the specific facts and evidence in an individual claim, as it requires analysis of the subjective belief of the persecutor." *See also Matter of L-E-A-*, 27 I.&N. Dec. 40, 43 (BIA 2017) (reversed in part by *Matter of L-E-A-*, 27 I.&N. Dec. 581, 581 (2019) (vacated pending rulemaking, *Matter of L-E-A-*, 28 I.&N. Dec. 304, 304 (2021)));  *see also Matter of M-F-O-*, 28 I. & N. Dec. 408, 417 n.6 (BIA 2021) (affirming that the BIA's "nexus analysis in *L-E-A-[2017]* remains good law"); *see generally Zavaleta  v. Sessions*, 873 F.3d 241 (4th Cir. 2017). In other words, the nature of the burden that asylum-seekers are required to carry requires providing a level of detail that is unavailable to the plaintiffs through no fault of their own when it comes to the harms stemming from the data breach.

Successfully carrying the evidentiary burden in a CAT case under the Plaintiffs' circumstances is similarly unreasonable, improbable, and contrary to due process. For CAT, applicants must prove that it is more likely than not that they would be tortured "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (2012). This requires showing that each step in a hypothetical chain of events that leads to torture is more likely than not to occur. *Matter of J-F-F*, 23 I&N Dec. 912, 917–18 (A.G. 2006). An applicant for CAT "will never be able to show that

---

[3]Available at: https://www.uscis.gov/sites/default/files/document/foia/Nexus_minus_PSG_RAIO_Lesson_Plan.pdf.

[they] face[] a more likely than not chance of torture if *one link* in the chain cannot be shown to be more likely than not to occur." *Id.* at 918, n.4 (emphasis added). "If the evidence is inconclusive, the applicant has failed to carry his burden." *Id.* at 917. For example, in *Ibarra Chevez v. Garland*, the respondent was denied relief where he feared gang and government actors in El Salvador, even though an expert witness testified that it was "*possible* that the MS-13 members in the United States will find out that Ibarra was a police informant and relay that news to the MS-13 in El Salvador." *Ibarra Chevez v. Garland*, 31 F.4th 279, 285 (4th Cir. 2022) (emphasis added) (internal punctuation omitted). Here, the Plaintiffs are presented with the same conundrum, but by fault of DHS itself: It is *possible*, but not *provable*, that the Plaintiffs' persecutors have access to their personal information, including the fact that they may soon be deported. On the other hand, by DHS's own admission, it *does* have access to this information, further underscoring the irrational requirement that the respondents rather than DHS supply this information.

**2. Burden shifting on specific issues is common in immigration courts and other federal courts.**

Burden-shifting is not a radical or unfamiliar concept in immigration court. Although the initial burden to prove relief eligibility falls on the asylum seeker, there are multiple instances where it shifts to the government by function of statute or regulation. *See, e.g.*, 8 U.S.C. § 1229a(c)(2) (placing the burden on the asylum-seeker if they have not previously been admitted to the U.S. but shifting the burden to the government if they have); 8 C.F.R. § 1208.13(b)(1)(ii) (enumerating circumstances wherein the burden is shifted from the asylum-seeker to the government to prove lack of well-founded fear); *Matter of W-E-R-B-*, 27 I&N Dec. 795, 797 (BIA 2020) (discussing several burden-shifting provisions of 8 C.F.R. § 1240.8(d) and 8 C.F.R. § 1208.16(d)(2)).

In *Ortez-Cruz v. Barr*, the Fourth Circuit reiterated the importance of burden-shifting by remanding a case where the Immigration Judge had incorrectly placed the burden of showing future persecution on the respondent when it should have passed to the government because she had already shown past persecution. *Ortez-Cruz v. Barr*, 951 F.3d 190, 198 (4th Cir. 2020). In doing so, it acknowledged that it will in some instances be difficult, though not impossible, for the government to show that future persecution is unlikely, but that the burden-shifting necessarily "puts a thumb on the scale for applicants who show past harm" with respect to that particular question. *Id.* at 198, 200. Similarly, the Plaintiffs do not request an inflexible rule or suggest that DHS could never rebut a presumption of harm from the data breach, only that the burden should be on the government to do so with respect to this particular question.

Furthermore, it is well-established that federal district courts have the authority to order burden shifting in the immigration court context. For example, in *Franco-Gonzalez v. Holder*, the U.S. District Court for the Central District of California ordered bond hearings after six months of detention, wherein "the Government bears the burden of justifying their continued detention by clear and convincing evidence." *Franco-Gonzalez v. Holder*, No. 10-cv-02211, 2013 WL 3674492, at *13 (C.D. Cal. Apr. 23, 2013). Similarly, in *Dubon Miranda v. Barr*, the U.S. District Court for Maryland ordered the Department of Justice to not only "consider a noncitizen's ability to pay a set bond amount and his or her suitability for release on alternative conditions of supervision," but to also adhere to the requirement that DHS "bear the burden of proving, by clear and convincing evidence, that a noncitizen is a flight risk or a danger to the community." *Dubon Miranda v. Barr*, 463 F. Supp. 3d 632, 652–53 (D. Md. 2020), vacated and remanded sub nom. *Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022). Other cases have similarly found burden shifting to be a reasoned remedy. *Guerrero-Sanchez v. Warden York Cnty. Prison*, 905 F.3d 208, 222 (3d

Cir. 2018) (shifting the burden to the government to justify prolonged detention), *abrogated on other grounds by Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827 (2022); *Brito v. Barr*, 415 F. Supp. 3d 258, 266 (D. Mass. 2019), aff'd in part, vacated in part on other grounds *sub nom. Brito v. Garland*, 22 F.4th 240 (1st Cir. 2021) (holding that the government should bear the burden of proof in immigration bond hearings).

In other areas of the law, "[p]resumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof." *Int'l Bhd. Of Teamsters v. United States,* 431 U.S. 324, 359 n.45 (1977) (citing C. McCormick, Law of Evidence §§ 337, 343 (2d ed. 1972)). This logic is especially persuasive here, where the government has far superior access to the relevant probative evidence that may be necessary for the plaintiffs to carry their legal burdens.

## B. WITHOUT A PRESUMPTION, THE CURRENT REMEDY IS INSUFFICIENT AND DOES NOT MAKE PLAINTIFFS WHOLE.

### 1. ICE has not provided meaningful access to important evidence related to the data breach.

The opportunity to relitigate one's claim does not entitle Plaintiffs to information that the government possesses and to date, ICE has refused to share. ICE notified Plaintiffs that their data had been breached by sending them letters stating in part:

> We are writing to inform you of an unintentional information disclosure that occurred on November 28, 2022. On that date, *a document* was mistakenly posted on Immigration and Customs Enforcement's (ICE) public-facing website, ICE.gov, that included limited information on some individuals in     ICE         custody, Specifically, the document contained names, A-numbers, dates of birth, counties of citizenship, detention facility names, and *other immigration information*, including credible or reasonable fear decisions associated with each case. Unfortunately, ICE's review has determined that your information was included in the document.

Ex. A of First Am. Compl., ECF No. 6-1 (emphasis added).

ICE's letter shows that ICE leaked "a document" that included not only the information listed in the notification letters but also "other immigration information." *Id.* To date, ICE has not revealed the name or type of document posted on the website, nor has it explained what "other immigration information" was released, even in cases where CAIR Coalition attorneys specifically asked DHS counsel for that information.

Further, ICE has not released any metadata about the breach, such as a list of IP addresses that accessed the leaked information. Given that DHS refuses to share exactly what was breached and who viewed the data, Plaintiffs are currently required to obtain evidence they cannot access.

### 2. Plaintiffs who relitigate their fear claims without access to the missing evidence have no meaningful remedy.

Without a presumption shifting the burden to DHS or access to meaningful information about what data was leaked and to whom, reopening proceedings is an empty procedural gesture that does not make the Plaintiffs whole. Plaintiffs therefore ask this Court to fashion a meaningful and measured remedy, in the form of burden-shifting regarding Plaintiffs' fear based on the data breach. "[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 129 n.20 (1983) (explaining that "a plaintiff need only allege an injury that is 'legally redress*able*'" such that "the granting of judicial relief will not be an exercise in futility" (quoting *Jenkins v. McKeithen*, 395 U.S. 411, 424 (1969)) (emphasis in original)). DHS's current mitigation is just such an "exercise in futility" and therefore does not render the requested relief moot. *Id.*

Court cases, regulations, and agency guidance all affirm that a breach of asylum seekers' confidentiality can place them at risk of serious harm. *See Anim v. Mukasey*, 535 F.3d 243, 253 (4th Cir. 2008) (explaining that "if an asylum applicant's confidentiality has been breached in

violation of [8 CFR] § 208.6, the applicant must be given the opportunity to establish a new claim for asylum, withholding of removal, or relief under CAT based on the breach" because that breach "'could subject the claimant to retaliatory measures by government authorities or non-state actors in the event that the claimant is repatriated'" (quoting U.S. Customs & Immigration Servs. Asylum Div., U.S. Dep't of Homeland Sec., Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants (2005)). Each case will still be evaluated individually based on its facts and the circumstances of the breach. *See id.* at 255 (remanding a case to allow the respondent to present arguments on the consequences of a breach).

There is no right to discovery in immigration court, nor is there any requirement akin to a *Brady* rule that obligates the prosecuting party to share potentially exculpatory information. *Compare Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process") *with Matter of Khalifa*, 21 I&N Dec. 107, 112 (BIA 1995) (affirming the denial of a discovery motion and observing that "there is no right to discovery in deportation proceedings"); *see also generally* Geoffrey Heeren, *Shattering the One-Way Mirror: Discovery in Immigration Court*, 79 Brooklyn L. Rev. 1569 (2014) (contrasting the expansion of discovery in criminal and other administrative contexts with the ineffectual practices in immigration court). In many instances, the respondent may be in the best position to identify and access information regarding their own fear. But in this situation, the exact opposite is true. DHS, as the source of the data leak, is far better positioned to explain how its own actions might affect the respondent. For example, DHS could identify what personal identifying information ("PII") about each given asylum seeker was shared, and whether any known IP addresses in the respondents' home countries accessed that information. Without that information, respondents are armed with little more than their own worst fears about who may

have accessed sensitive information about them. *See Matter of S-M-J-*, 21 I. & N. Dec. 722, 727 (BIA 1997) (en banc) (recognizing that principles of fairness and obligations under international refugee law may in some instances require DHS to submit evidence that develops the record because "immigration enforcement obligations do not consist only of initiating and conducting prompt proceedings that lead to removals at any cost. Rather, as has been said, the government wins when justice is done").

Because of the information asymmetry between DHS and the victims of this data breach, reopening proceedings does not allow the victims a meaningful opportunity to present new evidence about how the breach places them in danger. DHS has provided the victims with nothing more than an opportunity to present evidence that only DHS has and will not share. Without an obligation for DHS to disclose more details about the data breach, there is little new information that the respondents can present, and additional procedural protections are essentially futile.

### 3.   CAIR Coalition has repeatedly tried to access this evidence to no avail.

Knowing that additional evidence related to the data breach exists, CAIR Coalition has tried to secure it. For example, CAIR Coalition represents a young Central American man[4] who fled horrific domestic violence in his home country, entered the United States two decades ago, and was detained in October 2022. One month later, ICE leaked his data. Before his immigration hearing, his attorney wrote to DHS counsel requesting: (1) the leaked document or a list of PII that was shared in the leaked document, and (2) a list of individuals and entities which accessed the page during the five hours it was online. The DHS replied that it would not share any information beyond which was already disclosed on the data breach landing page on ICE's website.

---

[4] CAIR Coalition continues representing this noncitizen, and more information about his case is available upon request.

After receiving DHS's response, CAIR Coalition filed a motion to compel with the Immigration Judge requesting that the court compel DHS to disclose the requested information. The Immigration Judge denied the motion at the start of the Individual Calendar Hearing,[5] indicating that his authority to compel evidence could not exceed the scope of his regulatory subpoena power in 8 CFR § 1003.35. He explained that the attorney should have first submitted a Freedom of Information Act (FOIA) request to ICE to satisfy the regulation's "diligent efforts" requirement and that had she done so, he would have granted the motion. The Immigration Judge then denied this young man's claim for relief, a decision CAIR Coalition is appealing.

The IJ's response to this motion was not grounded in law. CAIR Coalition knows of no legal requirement to submit a FOIA request as a prerequisite to filing a motion to compel. Even analogizing to the subpoena powers granted by 8 CFR § 1003.35, counsel argued that outreach to DHS counsel should constitute diligent efforts because, as the Ninth Circuit found in *Dent v. Holder*, the evidence sought was directly related to the respondent's burden of proof in showing eligibility to relief. 627 F.3d 365, 374 (9th Cir. 2010). Specifically, the *Dent* court reasoned that relying on FOIA as a disclosure mechanism in removal proceedings was a violation of the respondent's due process rights because the FOIA process is too slow to guarantee actual access. *Id.* at 374. Instead of engaging with the court's legal holding in *Dent v. Holder,* the IJ instead flatly dismissed it as non-binding. Curiously, the IJ also acknowledged that he would not have required the results of the FOIA to grant the motion to compel, but simply evidence of a FOIA request, implying he understands what the Ninth Circuit held—that the FOIA process does not guarantee access to evidence. *See id.* (acknowledging that "FOIA requests often take a very long time,

---

[5] An Individual Calendar Hearing is a hearing where noncitizens argue the substantive reasons they believe the immigration court should grant them relief. Noncitizens may present evidence, testify, call witnesses, and make legal arguments to show they can meet their burden.

continuances in removal hearings are discretionary, and aliens in removal hearings might not get responses to their FOIA requests before they were removed").

It is indeed doubtful that ICE would meaningfully and punctually respond to FOIA requests about the breached data. FOIA requests give agencies a minimum of 20 working days to determine whether they will comply with the request and provide the information sought. *See* 5 U.S.C. § 552(a)(6)(A)(i). ICE seems to believe it cannot or will not comply with that deadline, noting on its website, "We are currently experiencing a high volume of FOIA requests and we thank you for your patience during this time."[6] ICE's delayed or unanswered responses to FOIA requests have been the subject of litigation in this very court. *See, e.g.*, Compl. at ¶¶ 16, 19–22, *District of Columbia v. U.S. Immigration and Customs Enforcement*, No. 18-cv-2410 (D.D.C. Oct. 22, 2018) (describing a FOIA request to ICE submitted on July 19, 2018 that went unanswered until September 5, 2018, when ICE invoked a 10-day extension, which then lapsed without any response from the agency); *See also* Tr. of Status Conference at 9:2–10:21, *Susan B. Long, et. al v. Immigration and Customs Enforcement, et. al*, No. 14-cv-109 (D.D.C. July 29, 2021) (responding to the agency's post-order FOIA response by saying: "I am literally at a loss right now. I am at a loss. I have never, in my judicial career, had an agency respond to a judicial order in the way that ICE has responded to this order in this case. The agency had a full and fair opportunity to litigate this thing to the maximum extent possible . . . do you think what the agency has produced is consistent with the opinion? . . . This is a 95% redacted document, and what you've given them is essentially nothing.").[7]

---

[6] *See Freedom of Information Act (FOIA)*, Immigration & Customs Enforcement, https://www.ice.gov/foia.

[7] For a full transcript of this hearing, *see* https://foiaproject.org/dc_view/?id=21033425-dc-12014cv00109-userdoc-1872-080-hearing-transcript.

In the case of this domestic violence survivor, then, the DHS Counsel refused to provide additional information in its possession, and the Immigration Judge denied a motion to compel based on a nonexistent legal standard, both of which inhibited this young man's access to probative evidence of the harm he faces. In two other cases, CAIR Coalition has submitted FOIA requests to ICE and is awaiting the result, while simultaneously preparing to submit motions to the immigration court.

Yet CAIR Coalition's represented clients are among the lucky ones: only about 30% of detained noncitizens nationwide have legal counsel.[8] And to date, CAIR Coalition, with a staff of over 100 people, has been unable to secure additional evidence about the data breach for its represented clients, whether through conferencing with DHS counsel, FOIA requests, or motions before immigration courts. Thus, the notion that FAQs and a list of legal service providers along with the letter informing Plaintiffs about the data breach in any way compensate for the data breach is simply untrue. *See* Ex. A of First Am. Compl. (noting that ICE has offered a list of "free or low-cost legal representatives"). Undersigned *amicus* is one such legal provider whose zealous efforts to secure probative, relevant evidence have thus far failed.

Detained *pro se* asylum seekers are even worse off—they have no mechanism to email DHS attorneys from detention; their limited internet access makes FOIA requests nearly impossible, particularly considering that many people in immigration proceedings do not speak fluent English; and they have no way of knowing about rights to submit motions to compel or subpoena. CAIR Coalition, as one of the few *pro bono* legal service providers in our region that

---

[8] *See* https://perma.cc/HPX7-GPF6.

assists detained adults,[9] has received numerous questions and requests from *pro se* litigants struggling to understand their rights regarding the data breach. CAIR Coalition has not been able to fully respond to the demand for representation from the impacted asylum seekers, meaning numerous vulnerable victims of the data breach must represent themselves in our region. While limited access to data in DHS's possession negatively affects all people in removal proceedings, *pro se*, detained respondents are especially harmed by this reality.

### 4.   The inability to access this evidence violates Plaintiffs' due process rights.

The government's unwillingness to share relevant, probative evidence in its sole control violates due process. Non-citizens in removal proceedings are protected by the Fifth Amendment's guarantee of due process. *Reno v. Flores*, 507 U.S. 292, 306 (1993). Those protections entitle Plaintiffs to a fundamentally fair hearing. *Matter of R-C-R-*, 28 I&N Dec. 74 (BIA 2020). A "meaningful opportunity to be heard" includes a "reasonable opportunity" to present evidence. *Hussain v. Gonzalez*, 424 F.3d. 622, 626 (7th Cir. 2005); *see also Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) ("[A]n alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf."); *Dent v. Holder*, 627 F.3d at 374  (holding that the petitioner had a due process right to review his A-file); *Hammad v. Holder,* 603 F.3d 536, 545 (9th Cir. 2010) (explaining that although the rules of evidence are not applicable to immigration hearings, the proceeding must be conducted in accordance with due process standards of fundamental fairness). Plaintiffs further enjoy a statutory right to present evidence in support of eligibility for relief. 8 U.S.C. § 1229a(b)(4)(B).

---

[9] *See, e.g.*, List of Pro Bono Legal Service Providers for Virginia, Dep't of Justice (updated April 2023) https://www.justice.gov/eoir/file/ProBonoVA/download (providing a list on which most other providers state that they do not represent detained adults).

Without access to the relevant evidence about the data beach or a shifting burden, the reopened proceedings do not conform with due process because they do not provide Plaintiffs with a "reasonable opportunity to present evidence" that ICE's actions harmed them. *See Colmenar v. INS*, 210 F.3d at 971. This due process violation is an additional reason that this Court should require immigration judges to adjudicate Plaintiffs' fear-based claims with a presumption that the data breach increases the risk of harm noncitizens face if deported.

In theory, ICE has an ethical duty to disclose this highly probative information to the affected asylum seekers and their legal representatives to ensure that justice is done. *See* Memorandum from Kerry E. Doyle, Principal Legal Advisor, to All OPLA Attorneys re: Guidance to OPLA Attorneys Regarding the Enforcement of Civil Immigration Laws and the Exercise of Prosecutorial Discretion (April 3, 2022) at p. 9 ("To that end, OPLA attorneys are empowered and expected to use their professional judgment to do justice in each case, whether the decision relates to: filing an NTA; moving to dismiss, administratively close, or continue proceedings; stipulating to issues, relief, or bond; or pursuing an appeal."); *see also Matter of S-M-J-*, 21 I&N Dec. at 727 ("Immigration enforcement obligations do not consist only of initiating and conducting prompt proceedings that lead to removals at any cost. Rather, as has been said, the government wins when justice is done."). Relitigating claims, without more, offers no justice. This Court should therefore order that Plaintiffs are entitled to the presumption they seek.

### 5. This evidence is especially relevant and probative given the autocratic regimes and violent nonstate actors that the Plaintiffs fear.

Although the strict application of Federal Rules of Evidence is not required in removal proceedings, *Matter of Wadud*, 19 I&N 182 (BIA 1984), immigration courts should admit evidence that is probative, relevant, and fundamentally fair, *Matter of Ramirez-Sanchez*, 17 I&N Dec. 503 (BIA 1980). Regulations and case precedents require that evidence be relevant and probative. 8

CFR § 1240.1(c) authorizes the Immigration Judge to "receive and consider material and relevant evidence." *Matter of Teixeira,* 21 I&N Dec. 316, 320 (BIA 1996). The overarching principle for admissibility of evidence in immigration court requires that evidence be "probative." *See Matter of Y-S-L-C-*, 26 I&N Dec. 688, 690 (BIA 2015). Evidence that CAIR Coalition has tried to obtain about the data breach, such as the nature of the leaked document and the IP addresses of computers that accessed this data is probative and relevant because it could either form a separate basis for a new reasonable fear of harm or bolster the Plaintiffs' pre-existing fear-based claims.

The government argues that unauthorized disclosure of confidential information cannot on its own establish eligibility for asylum. *See* Defs.' Mot. Dismiss & Mem. Supp. at 18–19 ("Mot. Dismiss"), ECF No. 33. This is unsupported by the precedent. Federal regulations recognize the sensitivity of asylum applications and the confidential information inherent in these applications. *See* 8 C.F.R. § 208.6. Federal courts have acknowledged that asylum seekers have a strong privacy interest which must be respected and protected by the U.S. government and that the exposure of asylum seekers' confidential information itself could form the basis for relief. *See, e.g.*, *Anim*, 535 F.3d at 256 (remanding for consideration of whether an investigator's breach of her confidentiality raised a new claim for relief); *Lin v. U.S. Dep't of Justice,* 459 F. 3d 255, 268 (2d Cir. 2006) ("The government's violation of section 208.6, however, is not merely a procedural flaw in an immigration proceeding. The government through its negligence has potentially exposed Lin and his family to risks beyond those that he claims caused him to flee China.").

In addition, the 6,000 plus individuals impacted by the data breach had already presented their fear-based claims during their credible or reasonable fear interviews, meaning that that they already had expressed a fear of return prior to the data breach. *See* Ex. A of First Am. Compl. (noting that the breach included "credible or reasonable fear decisions associated with each case").

Thus, Plaintiffs do not argue that the breach alone "establishes" asylum eligibility, *see* Mot. Dismiss at 18–19, but that this breach has the potential to further heighten their risk of harm from state and non-state actors that they already feared. *See Zambrano v. Sessions*, 878 F.3d 84, 88 (4th Cir. 2017) ("New facts that provide additional support for a pre-existing asylum claim can constitute a changed circumstance.").

Because certain foreign governments actively identify, track and monitor those who oppose them, disclosure of PII poses significant risk to the lives of asylum seekers who fear harm from state actors based on their political opinions or activism. For example, CAIR Coalition represents many individuals from the increasingly anti-democratic nation of El Salvador,[10] whose cyber surveillance suggests that the government can and will retrieve asylum seekers' PII off the dark web.[11] For example, President Nayib Bukele has recently used Pegasus spyware to infiltrate the devices of journalists and activists critical of his administration.[12] Other foreign countries represented among the Plaintiffs, such as Venezuela, similarly use electronic methods to surveil

---

[10] For information regarding El Salvador's increasing use of anti-democratic measures, *see, e.g.* Jude Webber, *El Salvador's president seizes control of top court with firing of judges*, Financial Times, (May 2, 2021), https://www.ft.com/content/e59496a6-a844-425c-85ed-98341a26093e; U.S. Dep't of State, *El Salvador 2022 Human Rights Report*, https://www.state.gov/wp-content/uploads/2023/02/415610_EL-SALVADOR-2022-HUMAN-RIGHTS-REPORT.pdf (noting that the Bukele administration's replacement of Supreme Court judges was seen as efforts to "cement the executive branch's control over the nominally independent judiciary"); *El Salvador: One year into state of emergency, authorities are systematically committing human rights violations*, Amnesty International, (April 3, 2023) (explaining that the state of emergency, issued one year ago in response to gang violence, has resulted in arbitrary detention, "ill-treatment and torture; flagrant violations of due process; enforced disappearances; and the deaths in state custody of at least 132 people who at the time of their deaths had not been found guilty of any crime").

[11] *See also* Decl. of ROE #31 ¶ 3, ECF No. 16-31, ("I fear for my life if I am returned to El Salvador. Now my private information has been leaked, I fear that outcome even more.").

[12] *Amnesty International Verifies Use of Pegasus Spyware against Journalists in El Salvador*, Amnesty International (Sept. 26, 2022) https://www.amnesty.org/en/latest/news/2022/01/el-salvador-pegasus-spyware-surveillance-journalists/.

political opponents. *See Venezuela 2022 Human Rights Report*, U.S. Dep't State at 26–28[13] (explaining how "[r]egime-controlled intelligence agencies, which lacked independent oversight, conducted surveillance for political purposes"). For corrupt and authoritarian regimes already engaged in electronic surveillance of potential dissidents, ICE's leaked data presents an easy way to access pertinent information.

Plaintiffs' fears are not limited to foreign governments—asylum seekers can and do assert meritorious claims based on fears of harm by a variety of non-state actors. [14] *See Matter of A-B-*, 28 I&N Dec. 307, 309 (A.G. 2021) (clarifying that there is no "presumption against asylum claims based on private conduct"). For example, organized crime groups such as transnational gangs have tracked individuals from their detention in the U.S. through their deportation and then harmed them. *See* Michael Paarlberg, *Gang Membership in Central America: More Complex than Meets the Eye*, Migration Policy Institute (Aug. 26, 2021) (explaining how "U.S. gang members, including those in detention centers, . . . monitor and inform superiors about people they have identified as rivals who will be returning to their origin country.").[15] The information that a given asylum seeker is in removal proceedings and detained at a particular facility therefore allows these criminal groups to identify and track existing targets with even greater accuracy.

The leak of Plaintiffs' PII is all the more troubling in this context, as transnational gangs, drug cartels, death squads, or mafias—all of which are notorious for their disregard of the rule of law—are highly unlikely to respect the Department of Homeland Security's unenforceable

---

[13] Available at https://www.state.gov/wp-content/uploads/2023/02/415610_VENEZUELA-2022-HUMAN-RIGHTS-REPORT.pdf.

[14] *See, e.g.*, Decl. of ROE #13 ¶¶ 2-5, ECF No. 16-13 (fearing violence from armed groups in Colombia).

[15] Available at https://www.migrationpolicy.org/article/complexities-gang-membership-central-america.

clawback letters. The government acknowledges that it has issued at least some of these letters, but has not disclosed to whom, nor does it offer any assurances that the letters were complied with. *See* Ex. B of First Am. Compl. ¶ 7 (acknowledging that the government has already sent clawback letters to unspecified "external entities or individuals"). The mere fact that at least some letters were issued is a cold comfort to the asylum seekers wondering whether the persecutors they fear have accessed their PII, particularly where their lives may depend on proving it.

Thus, aside from the violation of privacy and due process, this data breach presents unique harms to Plaintiffs fearing autocratic regimes and criminal groups like transnational gangs. All of CAIR Coalition's clients whose data ICE leaked fall into these categories, and the opportunity to relitigate their claims, without more, is not a meaningful remedy. This Court must therefore ensure that Plaintiffs enjoy a presumption of risk in any future hearings.

## C. THE CURRENT REMEDY IS IN FACT HARMFUL BECAUSE IT PROLONGS DETENTION.

Most of the data breach victims CAIR Coalition represents remain detained, even after being placed in 240 proceedings.[16] Of these detained clients, one is a Black man from the Caribbean who first entered the United States in 1993. His United States Citizen daughter served honorably in the U.S. military. He was awaiting his immigration hearing outside detention, had a work permit, and was complying with his immigration requirements when ICE inexplicably detained him in August 2022. CAIR Coalition then offered him representation. CAIR Coalition submitted evidence about the ICE data breach in advance of his Individual Calendar Hearing in December 2022. In his decision denying relief, the Immigration Judge discussed the breach in a single paragraph, stating that the evidence "merely reflects" that the data breach involved the

---

[16] CAIR Coalition still represents all the clients described in this section. More information about each client is available upon request.

sharing of PII. The IJ found it speculative that the breach increases the risk of harm. In March 2023, ICE conducted a custody redetermination interview and decided to continue this client's detention. DHS then re-initiated removal proceedings against him, as a remedy for having unlawfully posted his data online. This client's next Individual Calendar Hearing is scheduled for June 2023, three months after the DHS reinitiated proceedings.

This client has both cancer and a nerve disorder. He has submitted a release request in writing noting his health diagnoses, which ICE has never answered, despite counsel's repeated re-sending and escalation. He has now been detained for over eight months while seriously ill—he will have been detained 10 months by the time he has his next hearing. As his health deteriorates, he now must relitigate his claim from inside detention, with no greater access to information about the ICE data breach than he had in December.

Another client, who fled his father's murderers in his home country and has lived in the U.S. since 2015, has been detained since August 2022. Like the man from the Caribbean, this client raised the data breach during his first immigration hearing in December 2022, but the IJ found it speculative that the breach increased his risk of harm. Still, DHS reinitiated removal proceedings against him, though DHS took three months to file his Notice to Appear.[17] His Individual Calendar Hearing is now set for June 2023, by which time he will have been detained for 10 months.

A third client designated mentally incompetent by an immigration judge,[18] had his Individual Calendar Hearing in March 2023. This young man first entered the United States in

---

[17] The Notice to Appear ("NTA") is the charging document that the Department of Homeland Security files with the immigration court to initiate removal proceedings.

[18] *See Matter of M-A-M-*, 25 I&N Dec. 474 (BIA 2011) (holding that noncitizens are incompetent if they do not have a rational and factual understanding of the nature and object of the proceedings, cannot consult with the attorney or representative if there is one, and do not have a reasonable opportunity to examine and present evidence and cross-examine witnesses).

2012 and was detained in October 2022. Approximately one month later, ICE leaked his data. At his immigration hearing, the DHS acknowledged that the data breach means the client was no longer subject to the one-year filing deadline[19] but also expressed its intent to appeal an asylum grant. The client therefore accepted withholding of removal instead of asylum.[20] Despite having been a victim of the ICE data breach and winning relief, he is still awaiting his release from detention six months after first entering ICE custody.

The Central American man who survived domestic violence, *see* Section II.B.3, *supra,* lost his immigration case in April 2023. CAIR Coalition is appealing that decision. After having been detained six months already, and after the IJ refused to compel DHS to produce probative, relevant evidence, this domestic violence survivor will remain detained throughout his appeal, a process than can take an additional six to eight months.

For detained clients, then, the remedy of reinitiating immigration proceedings —without meaningful access to evidence about the breach and without a presumption—is no remedy at all. Instead, it simply prolongs detention.

### III. CONCLUSION

The current remedy of placing Plaintiffs in removal proceedings under 8 U.S.C. § 1229a is an insufficient remedy for ICE's violation of 8 C.F.R. § 208.6(a). Because the Department of Homeland Security has thus far refused to share additional information it possesses about the data breach, this Court should require immigration judges to adjudicate these cases with a presumption

---

[19] Noncitizens in removal proceedings must submit their Form I-589, Application for Asylum, within one year of entering the United States, unless there are changed or extraordinary circumstances. *See* 8 C.F.R. 208.4(a)(2)-(5).

[20] Applicants who win asylum become eligible to apply for Legal Permanent Residency and after holding LPR status for five years can apply for U.S. citizenship. 8 C.F.R. § 209.2; 8 U.S.C. 1421. Applicants who win withholding of removal cannot obtain LPR status or U.S. citizenship.

that the breach increases Plaintiffs' risk of harm, thereby shifting the burden to the DHS. The failure to do so denies Plaintiffs the due process right to make their claim "at a meaningful time and in a meaningful manner." *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Without such a presumption, the opportunity to relitigate claims merely sends already vulnerable asylum seekers, many of whom are *pro se* and detained, on a fool's errand to prove something only the government knows. As a result, DHS's offered remedy merely prolongs detention without providing any meaningful protection from the increased risks created by its exposure of their confidential information.

Dated: April 24, 2023                                   Respectfully Submitted,

Ellyn Jameson

/s/ Ellyn Jameson

D.D.C. Bar ID D00594
D.C. Bar No.1765412 *admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver) and supervised by a licensed D.C. Bar member*
PA Bar No. 328987
Capital Area Immigrants' Rights Coalition
1025 Connecticut Ave NW, Suite 701
Washington D.C., 20036
202-449-4586
ellyn@caircoalition.org

*Counsel for* Amicus Curiae*, Capital Area Immigrants' Rights Coalition*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with LCvR7(o)(4) because it does not exceed 25 pages in length.


/s/ Ellyn Jameson

D.D.C. Bar ID D00594
D.C. Bar No.1765412 *admitted to the Bar under D.C. App. R. 46-A (Emergency Examination
    Waiver) and supervised by a licensed D.C. Bar member*
PA Bar No. 328987
Capital Area Immigrants' Rights Coalition
1025 Connecticut Ave NW, Suite 701
Washington D.C., 20036
202-449-4586
ellyn@caircoalition.org
*Counsel for Movant, Capital Area Immigrants' Rights Coalition*

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2023, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

Respectfully Submitted,

/s/ Ellyn Jameson

D.D.C. Bar ID D00594

D.C. Bar No.1765412 *admitted to the Bar under D.C. App. R. 46-A (Emergency Examination Waiver) and supervised by a licensed D.C. Bar member*

PA Bar No. 328987

Capital Area Immigrants' Rights Coalition

1025 Connecticut Ave NW, Suite 701

Washington D.C., 20036

202-449-4586

ellyn@caircoalition.org

*Counsel for* Amicus Curiae*, Capital Area Immigrants' Rights Coalition*